**Opinion filed August 25, 2016**



# In The

# Eleventh Court of Appeals

_____

## No. 11-15-00147-CV

_____

## ROSEMARY BACA, Appellant

## V.

## ERASMO BACA, Appellee

**On Appeal from the County Court at Law**

**Ector County, Texas**

**Trial Court Cause No. CC-24,851**

## M E M O R A N D U M   O P I N I O N

This is an appeal from a final decree of divorce in which the trial court appointed Rosemary[1] Baca (Appellant) and Erasmo Baca (Appellee) as joint managing conservators of their minor child, A.B.  The trial court further appointed

---

[1]We note that Appellant's name is "Rose Maria" in her notice of appeal.  Appellant's name in her answer, in her counterpetition, in the final decree of divorce, and in her brief to this court is "Rosemary." When Appellant testified, she also introduced herself as "Rosemary Baca."  Accordingly, we have styled this case "Rosemary Baca v. Erasmo Baca."

Appellee as the conservator with the exclusive right to designate the primary residence of the child and ordered Appellant to pay child support to Appellee in the amount of $200 per month. We affirm.

We first note that Appellant has failed to comply with TEX. R. APP. P. 38.1. Appellant's brief is comprised of five hand-written pages in which she attacks the representation of the three attorneys that represented her during her divorce proceeding, alleges that there was no proof of abuse or neglect of the children, and attacks the trial court's denial of spousal maintenance and obligation to pay spousal rehabilitation. Appellant describes her filing as a "letter" and has not included any citations to the record or to any applicable law. Despite the fact that Appellant has failed to file a brief that meets the requirements of Rule 38.1, we will, nevertheless, address Appellant's arguments in the interest of justice.

Appellee identified four issues addressed by Appellant and responded to each of those four issues. In doing so, Appellee characterized Appellant's issues as follows: (1) a claim of ineffective assistance of counsel; (2) a challenge to the sufficiency of the evidence regarding the trial court's custody determination; (3) a challenge to the trial court's failure to award spousal maintenance; and (4) a challenge to the trial court's failure to award rehabilitation alimony. We agree with Appellee's characterization of the issues and will address Appellant's arguments as such.

Appellant's claim that her three attorneys rendered ineffective assistance is without merit. Claims of ineffective assistance of counsel are generally reserved for defendants in criminal cases because a person has the right to the effective assistance of counsel when he or she faces criminal charges. *See Strickland v. Washington*, 466 U.S. 668, 685–86 (1984) (recognizing that the right to counsel under the Sixth Amendment of the United States Constitution is the right to the effective assistance of counsel). The Supreme Court of Texas has extended the right to the effective

2

assistance of counsel to certain parental-rights termination cases: "We hold that the statutory right to counsel in parental-rights termination cases embodies the right to effective counsel." *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). The right is also afforded to the subject of an involuntary civil commitment hearing. *Chrisman v. Chrisman*, 296 S.W.3d 706, 707 (Tex. App.—El Paso 2009, no pet.). However, the doctrine of ineffective assistance of counsel does not apply to civil cases in which there is no constitutional or statutory right to counsel, such as divorce cases. *Culver v. Culver*, 360 S.W.3d 526, 535 (Tex. App.—Texarkana 2011, no pet.) (op. on reh'g); *see Chrisman*, 296 S.W.3d at 707 ("No Texas court has determined that a petitioner or respondent in a dissolution proceeding has the constitutional right to effective assistance of counsel and we decline to do so."); *see also Cojocar v. Cojocar*, No. 03-14-00422-CV, 2016 WL 3390893, at *7 (Tex. App.—Austin June 16, 2016, no pet.) (mem. op.) (citing to several cases from 2005 to 2013 for the proposition that the right to effective assistance of counsel does not extend to divorce cases). Therefore, we overrule Appellant's first issue.

In her second issue, Appellant challenges the sufficiency of the evidence to support the trial court's custody determination. Specifically, she alleges that there was no proof of abuse or neglect of the children, that there was no history of drugs or alcohol, and that she had no criminal activity. She further claims that she has never been absent from her child's life and that both she and her husband were verbally and physically abusive but that the abuse was directed only toward each other. Appellant also asserts that her oldest daughter's testimony should be disregarded because it was motivated by Appellee's money.

We review a trial court's custody determination under an abuse of discretion standard. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*,

701 S.W.2d 238, 241–42 (Tex. 1985). Under an abuse of discretion standard, challenges to the sufficiency of the evidence are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *Child v. Leverton*, 210 S.W.3d 694, 695–96 (Tex. App.—Eastland 2006, no pet.) (citing *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g)). The traditional sufficiency standards of review overlap the abuse of discretion standard; thus, we apply a two-prong analysis: (1) whether the trial court had sufficient information upon which to exercise its discretion and (2) whether the trial court erred when it applied that discretion. *Id.* at 696 (citing *T.D.C.*, 91 S.W.3d at 872). The traditional sufficiency review comes into play with regard to the first question. *Id.* (citing *T.D.C.*, 91 S.W.3d at 872). If we find that there is sufficient evidence, we next determine whether, based on that evidence, the trial court made a reasonable decision. *Id.* (citing *T.D.C.*, 91 S.W.3d at 872).

In considering a legal sufficiency challenge, we review all the evidence in the light most favorable to the trial court's judgment and indulge every reasonable inference in its favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit any favorable evidence if a reasonable factfinder could and disregard any contrary evidence unless a reasonable factfinder could not. *Id.* at 821–22, 827. In reviewing a factual sufficiency challenge, we consider all the evidence and uphold the finding unless it is so against the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

The best interest of the child is the primary consideration in determining issues of conservatorship. TEX. FAM. CODE ANN. § 153.002 (West 2014); *In re V.L.K.*, 24 S.W.3d 338, 342 (Tex. 2000). We review a trial court's best interest finding by using the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These non-exhaustive factors include the following: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the

4

emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

At the end of the bench trial, the trial court found that it was in the best interest of A.B. for Appellant and Appellee to be joint managing conservators, with Appellee as the primary caretaker. The trial court did not enter written findings of fact or conclusions of law. In the final decree of divorce, the trial court appointed Appellant and Appellee as joint managing conservators of A.B. and appointed Appellee as the conservator with the exclusive right to designate the primary residence of the child.

When the trial court does not enter findings of fact and conclusions of law, we presume that it made all the necessary findings to support its judgment as long as the record supports such findings. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Allen v. Allen,* 717 S.W. 2d 311, 313 (Tex. 1986). Here, our review of the evidence shows that the record supports such implied findings.

Appellant and Appellee had three children together: Sara Baca, Kelby Baca, and A.B. Sara, who was twenty-three years old at the time of the final hearing and was the parties' oldest daughter, testified that she believed it was best for A.B., the parties' youngest daughter, to live with Appellee. Sara testified that Appellant was neglectful in caring for A.B. in that she failed to treat A.B. for lice, did not regularly assist A.B. with her school work, and did not keep the house clean. Sara also testified that Appellant had been violent on many occasions. She explained that, on one occasion, Appellant beat through Kelby's door with a hammer and threatened to hurt Kelby if Kelby called the police. A picture of the damage to the door was admitted into evidence. Sara further testified that Appellant "becomes belligerent

5

and doesn't stop for hours." Sara also testified that Appellant made "bad" comments to A.B. about Appellee and that those were not the types of things that a child should hear. Sara estimated that Appellant was physically or verbally violent "[p]robably once a week, at times, every other day." On cross-examination, she clarified that Appellant had never beaten her or her two sisters but that she had repeatedly assaulted Appellee. Appellee had also hit Appellant on multiple occasions. At the time of the final hearing, Sara did not have a relationship with her mother and explained that she was testifying so that her sister would not have to live in such an environment.

Kelby, who was twenty-one years old at the time of the final hearing, testified that Appellant was both physically and verbally abusive to her. In addition to the incident in which Appellant beat down her door, Kelby testified that Appellant shoved her in the hallway when she was trying to get by Appellant to leave with Appellee. She also explained that, on one occasion, she called the police to report Appellant because Appellant was being violent and because she was afraid of what Appellant would do to her. When Appellant and Appellee were violent toward each other, Appellant was the one that "mostly" started it, both verbally and physically. Appellant also said bad things about Appellee and called Appellee vile names in front of A.B. The verbal abuse was not limited to private settings; it also occurred in public. Kelby believed that Appellant had trouble controlling herself. Generally, the arguments were based on Appellant's accusations that Appellee was looking at other women.

Kelby further testified that Appellant was a full-time housewife but that she did not keep the house in good condition. Kelby identified a picture of A.B.'s bedroom that depicted her bedroom in disarray. Kelby explained that A.B.'s room does not look like that anymore and that both A.B.'s bedroom and playroom were kept in good order. Since Appellant and Appellee separated, Kelby had been living

with Appellee and A.B. She explained that the environment was "much better" and "more peaceful" and that she and A.B. were happier. At the time of the final hearing, Kelby testified that she too did not have a relationship with her mother and explained that she was testifying so that A.B. would not have to "go through the violence that happened between [her] parents."

Appellee also testified about Appellant's acts of violence. He identified a picture that showed dents on the door of his pickup from where Appellant beat his pickup with a shovel. Appellee also offered, and the trial court admitted, several text messages and e-mails from Appellant to Appellee. Appellee testified that those messages were the typical type of communications that he received from Appellant. In the messages, Appellant called Appellee many derogatory names, such as "whore," "pervert," "slut," "little flirty b---h whore," "limp d--k," "a--hole," and "retarded whore brainless elephant man." Appellee admitted that he hit Appellant on a couple of occasions. He did not agree that he looked at other women inappropriately. He testified that Appellant was overly jealous and that he had never had an affair.

Appellant testified that Appellee sent her a lot of messages with foul language as well. She provided one text message in which Appellee called Appellant "f-----g dumb a--" and "stupid a--." She further testified that she did not tell A.B. anything bad about Appellee; "[A.B.] can see by herself." Appellant said that, when she and Appellee lived together, Appellee would drink a "sixpack" of beer several times a week and would get belligerent. They would then get into an argument, and he would become physically violent. He shoved her against the cabinets and called her names. She explained that they also got into arguments because he was a "womanizer" and flirted with women everywhere they went. She admitted that she hit her husband's pickup with a shovel. She explained that she became angry because he was flirting with a girl down the street.

7

Appellant believed that A.B. should live with her because A.B. was accustomed to Appellant taking care of her; she was the caregiver of the house. She did not believe that Appellee was capable of taking care of A.B. because he was always at work. Appellee worked full time and was usually gone from 7:00 a.m. until 5:00 p.m. Sometimes he worked late and did not get home until 8:00 p.m. At the time of the hearing, he was also working on Saturdays and Sundays. She explained that Appellee would leave A.B. alone with Kelby but that Kelby would not pay attention to A.B. Appellant further explained that Kelby was mildly autistic and antisocial, so she locked herself in her room a lot.

Appellant also testified that A.B. was not getting home-cooked meals at Appellee's house and that, instead, Appellee was giving A.B. frozen food or food from restaurants. Appellant previously cooked seven nights a week for her family. Appellant explained that the picture that showed that A.B.'s room was messy was from "one of the times that [A.B.] was in there playing and never put[] anything back." Appellant would have to go in there and help her clean after she made a mess; A.B. was seven or eight at the time the picture was taken. Appellant testified that it was not true that she did not help A.B. with her homework. Kelby also testified that, "[o]verall," Appellant was involved in A.B.'s schooling.

Appellant further believed that Appellee should not be the one in charge of A.B. because A.B. was very sad that Appellant was not there. When A.B. called Appellant, she was "almost at the point of crying." Appellant believed that A.B. was very lonely at Appellee's house. When Appellant dropped A.B. off at school on Monday mornings, A.B. cried and did not want to get out of the car. Appellant testified that A.B. was happy when she was with Appellant and that A.B. did not want to leave her. Appellant also explained that A.B. should stay with her because Appellee had the support of their two older daughters and because, if Appellant did not have A.B. anymore, she would be left with no children.

Appellant testified that she did not take any responsibility for the failed relationships with her two oldest daughters. She did not know why they had bad relationships but thought that it was possibly due to the children not wanting to make their father angry because he bought them cars and paid their bills. She explained that she broke down the door to Kelby's room because she was afraid for her daughter's well-being; Appellant never touched her or hit her. Her daughter had locked herself in her room, and Appellant was afraid that she might hurt herself. When Sara and Kelby were asked if Kelby had ever threatened to commit suicide, they both testified that Kelby had not.

We hold that the evidence in this case was both legally and factually sufficient to support the trial court's custody determination. Thus, the trial court had sufficient information upon which to exercise its discretion. *See Leverton*, 210 S.W.3d at 696 (citing *T.D.C.*, 91 S.W.3d at 872). The evidence presented at trial touched on four of the *Holley* factors: the emotional and physical danger to the child now and in the future, the stability of the home, the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *See Holley*, 544 S.W.2d at 371–72. Although Appellant testified that she believed that A.B. should live with her for a number of reasons, Appellee and the parties' two oldest daughters testified that they believed that A.B. should live with Appellee. They also testified that Appellant was violent and that she started the arguments with Appellee. Sara and Kelby further testified that they did not have a relationship with their mother and did not want A.B. to have to grow up in the same environment that they did. Appellant offered several excuses during her testimony as to why she behaved the way that she did and as to why she did not have a good relationship with her oldest daughters.

The trial court, as the factfinder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Golden Eagle Archery, Inc. v.*

9

*Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *Wright v. Wright*, 280 S.W.3d 901, 908 (Tex. App.—Eastland 2009, no pet.). Based on the evidence before it, the trial court could have disregarded Appellant's testimony and believed the testimony of Appellee, Sara, and Kelby. We cannot say that the trial court made an unreasonable decision when it appointed Appellee as the conservator with the exclusive right to designate the primary residence of A.B. *See Leverton*, 210 S.W.3d at 696 (citing *T.D.C.*, 91 S.W.3d at 872). Therefore, the trial court did not abuse its discretion. We overrule Appellant's second issue.

Appellant also challenges the trial court's failure to order Appellee to pay her spousal maintenance. She asserts that she cannot earn a sufficient income, at the minimum wage rate, to provide for her minimum reasonable needs. Appellee responds that, as a result of the trial court's property division, Appellant had sufficient cash funds to meet her reasonable needs and that Appellant failed to rebut the presumption that spousal maintenance was unwarranted under the circumstances of this case.

A trial court may award spousal maintenance to a spouse of a marriage that has lasted ten years or more if the party seeking maintenance lacks sufficient property to provide for her minimum reasonable needs and lacks the ability to earn sufficient income to provide for her minimum reasonable needs. FAM. § 8.051(2)(B) (West Supp. 2016). It is a rebuttable presumption that spousal maintenance is not warranted under Section 8.051(2)(B) unless, during the parties' separation and the pendency of the divorce proceeding, the spouse who seeks maintenance has exercised diligence in earning sufficient income to provide for her minimum reasonable needs or has exercised diligence in developing the necessary skills to provide for her minimum reasonable needs. *Id.* § 8.053. The trial court may consider the liquidity of the assets awarded to the party in the division of the marital property

when the court considers whether the party has sufficient property to provide for her needs. *See, e.g.*, *In re McFarland*, 176 S.W.3d 650, 658 (Tex. App.—Texarkana 2005, no pet.) (outlining several cases that have considered the amount of property awarded in the divorce proceeding when determining whether to award spousal maintenance).

Here, the trial court awarded Appellant $123,049 in cash as part of the just and right division of the marital property. The trial court specifically stated, at the conclusion of the bench trial, that it appeared that "the cash that would be left over . . . would take care of minimal needs with even a limited job, such as [Appellant] has, at this time." The trial court further stated, "So it pretty well takes out my awarding the request that has been made for continued support payments for nursing school." In addition to the sum of cash, the trial court awarded Appellant one-half of a $57,400 certificate of deposit, one-half of a $95,000 annuity, a $7,400 IRA, her 2010 BMW 528; household furnishings, personal effects, and the funds in Appellant's personal checking account, which had dwindled from over $18,000 to approximately $150 during the parties' separation.

Appellant testified that she did not work for months after the separation but that she later found a part-time job at Ross. At the time of the hearing, she was working twenty-five hours a week at a rate of $10.50 per hour; she did not have any other source of income. Appellant testified that there was only $150 remaining in her checking account and $200 in her savings account. She explained that she had to spend the money in her checking account on attorneys. When asked whether she sought other employment during the fifteen-month separation, Appellant responded, "Yes, sir. Nobody is willing to hire a person without experience." Appellant did not present any evidence regarding the extent of her employment search. She simply explained that she had applied online and was "constantly looking."

Appellant was a homemaker throughout the parties' marriage, and she did not graduate from high school. Appellant testified that she took home $200 a week and that, if the court ordered her to pay $200 a month in child support, she would be left with $600 a month. She testified that she was "homeless" and that she was afraid that she was "going to end up without a house." She knew she could not make it on $600 a month, and she hoped that she could go to nursing school so that she could make more money in the future. Appellant wanted the trial court to order Appellee to pay Appellant twenty percent of Appellee's gross salary for three years to help her pay for school. However, Appellant agreed that she could meet her needs if she received $167,000 as part of the division of the community property estate.

We agree that Appellant failed to establish by a preponderance of the evidence that she exercised diligence in earning sufficient income and in developing the skills necessary to provide for her minimum needs while the parties were separated. Appellant did not present any evidence that showed that she attempted to find employment that would offer a higher income or would allow her to work more hours. She also did not present any evidence that she tried to develop any skills that would further her chances to secure employment that would provide for her reasonable minimum needs. Although she testified that she wanted to go to nursing school, she did not pursue nursing school during the parties' fifteen-month separation.

Furthermore, the record shows that the trial court ordered Appellee to pay temporary spousal support in the amount of $1,000 per month for over one year. In addition to the temporary spousal support, the trial court ordered Appellee to pay the household bills and mortgage associated with the marital home, the usual and customary gasoline requirements of Appellant, the rent on an apartment for Appellant, the deposits and utility bills for Appellant's apartment, and the debts on the automobiles of the family. Even after the trial court had ordered that Appellee

12

did not have to continue to pay spousal support to Appellant and did not have to continue to pay several of Appellant's bills, Appellee chose to continue to pay for Appellant's BMW so that he could pay the loan off in full. Appellee also testified that Appellant withdrew all of the money out of their joint checking account at the time that they separated. He did not know what that money went toward; the sum of money withdrawn was $15,379.86. Appellant testified that she withdrew that money to pay her attorneys and to buy a washer and dryer, some furniture, a mattress, a microwave, and other items for her apartment.

Based on Appellant's failure to rebut the presumption in Section 8.053 and based on the amount of spousal support that Appellant received during the separation as well as the amount of property she received in the division of the marital estate, we cannot say that the trial court abused its discretion when it denied Appellant's request for spousal maintenance. Therefore, we overrule Appellant's third issue.

In Appellant's final issue, she asserts that Appellee was obligated to pay her rehabilitation alimony. We first note that we have not found where in the record Appellant sought relief for "rehabilitation alimony." In her counterpetition, Appellant sought "postdivorce maintenance for a reasonable period in accordance with chapter 8 of the Texas Family Code," and she also sought temporary support from Appellee until the trial court entered a final decree of divorce. However, she did not seek rehabilitation alimony. Moreover, the Family Code does not authorize a trial court to award this type of relief to a party in a divorce proceeding in Texas. The relief allowed in Texas for support after a divorce is spousal maintenance. *See* FAM. § 8.051 (allowing for the award of spousal maintenance under certain circumstances). "Alimony" may only be ordered if the parties have entered into a contract in which one party has agreed to pay the other party alimony. *Francis v. Francis*, 412 S.W.2d 29, 32–33 (Tex. 1967); *McCollough v. McCollough*, 212 S.W.3d 638, 642–46 (Tex. App.—Austin 2006, no pet.). There is no evidence of

13

such a contract in this case, and we have already disposed of Appellant's complaint that the trial court erred when it failed to award her spousal maintenance. Therefore, Appellant's fourth issue is overruled.

We affirm the judgment of the trial court.


JIM R. WRIGHT

CHIEF JUSTICE


August 25, 2016

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.